THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY WOMACK, Defendant-Appellant.

First District (6th Division)   No. 1—88—0795

Opinion filed July 12, 1991.

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant Gregory Womack was convicted of murder and two counts of armed robbery. Defendant was sentenced to life imprisonment, with two 30-year concurrent prison terms. Defendant appeals, contending that law enforcement authorities failed to scrupulously honor his invocation of his right to remain silent. We affirm.

Prior to trial, defendant filed a motion to quash arrest and suppress evidence. The grounds for the motion were twofold, namely: (1) that defendant was not advised of his *Miranda* warnings; and (2) that defendant's confession was involuntary, being the result of physical abuse. Defendant, in his motion to quash and suppress, did not allege that his confession was constitutionally infirm due to failure on the part of law enforcement authorities to honor his fifth amendment to the United States Constitution (U.S. Const., amend. V) right to remain silent, which is the issue defendant now raises on appeal.

At the hearing on the motion to quash and suppress, the following evidence was elicited. Defendant testified that he was arrested at sometime around 2 a.m. or 3 a.m. on June 10, 1986, while he was at home. He heard knocking at the door, and when he opened it he saw several police officers. The officers told defendant to get dressed, and they took him to the police station. At the station, defendant was fingerprinted, a gunshot residue test was performed on defendant and defendant was placed in a lineup. While defendant related that the police officers who arrested him at his house talked among themselves, and told him to get dressed and placed him under arrest, defendant did not indicate whether he was advised of his *Miranda* warnings.

Two police officers were called by the State at the hearing on the motion to quash arrest. Detective John Yucaitis and his partner, Detective Peter Dignan, responded to a radio call at about 1 a.m. on June 10, 1986. Yucaitis testified that the detectives spoke with the murder victim's three companions. One of them knew the

shooter as Womack and also knew that Womack lived in Altgeld Gardens. Two of the victim's companions identified defendant from a mugshot, while another companion of the victim later identified defendant from a photo array at the hospital. Detective Dignan testified that when defendant was arrested, Dignan gave defendant *Miranda* warnings.

At the hearing on the motion to suppress defendant's statements, it was stipulated that both Detectives Yucaitis and Dignan would testify the same as they had during the hearing on the motion to quash concerning the giving of *Miranda* warnings. Detective Daniel McWeeny testified that he did not see defendant placed under arrest but that he saw defendant placed in the squad car. He never asked defendant any questions and he never saw anyone strike defendant.

Detectives Yucaitis and Dignan also denied that anyone struck defendant at the time of or at any time after defendant's arrest. Yucaitis testified that defendant was not questioned about the shooting during the ride to the police station. Dignan testified that defendant made statements concerning the shooting while at defendant's home. Once at the station, at about 5 a.m., Dignan advised defendant that defendant was going to be in a lineup, but defendant did not make any statements about the shooting.

The trial court denied both the motion to quash arrest and to suppress defendant's statements, holding that defendant was sufficiently advised of his *Miranda* warnings and that there had been no physical force in the obtaining of defendant's confession.

The following evidence was elicited at trial. Late at night on June 9, 1986, the murder victim, Richard Pippen, and four of his friends, Curtis Powe, Kevin DeFel, Leonard Sago and Rickey White, were standing on a street corner as two of them spoke on a telephone. Pippen's four friends all testified at trial. Their testimony established that defendant approached them and began talking with them. Defendant said that his name was Womack, that he had gotten out of prison a few days earlier, and defendant introduced a friend of his whom he identified as Cato. Powe and DeFel had seen defendant in the neighborhood previously.

The group talked while standing on the corner for 15 to 30 minutes. Powe, DeFel and White each testified that defendant asked for a ride to Riverside and that defendant volunteered to pay some money toward gasoline. Sago, who owned the car, testified that defendant showed him a gun under his jacket and said that if Sago said anything defendant would take them all out. The group en-

tered the car and Sago, who did not tell his friends about the gun, began driving.

Sago stopped at a gas station to check his rear tire, which had loose lug nuts. Powe and DeFel testified that defendant asked if anyone had a gun. DeFel said that he had a gun, although this was not true. Sago next drove to an area at the request of defendant so that defendant could go to his girlfriend's. Near the corner of 133rd Street and Prairie, in Chicago, Illinois, Sago again stopped the car to tighten the lug nuts on the rear wheel. The group got out of the car. Defendant and his friend Cato (subsequently identified as Bruce Fields) engaged in a conversation, and then defendant again asked DeFel if DeFel had a gun. When DeFel said that he did not, defendant pulled out his gun, grabbed DeFel and pointed the gun at him. Defendant asked the witnesses if they had any money, and they said they did not.

Sago was holding a screwdriver and a jack, which defendant ordered Sago to throw down. When Sago failed to throw the tools down, Womack fired a warning shot in the air. Sago dropped the screwdriver. Fields then picked up a wrench and hit Sago on the head with it. Defendant walked Sago and DeFel down the street, while Fields stayed in the car with Pippen and Powe. Fields searched Pippen and Pippen gave Fields some money. When Fields attempted to hit Powe with the wrench, the latter ran away to summon help. Defendant fired a shot at Powe, but missed him. When Powe returned to the scene, Pippen was lying on the ground and the police were there.

Sago and DeFel testified that defendant fired a shot at Powe as Powe ran away. Then Fields came over to Sago and began beating him over the head with the wrench, at which point Sago passed out. DeFel testified that as Fields was beating Sago, Pippen came to the corner and asked why Fields was beating Sago. Defendant pointed the gun at Pippen and fired the gun, and Pippen began to run away. Fields then began to kick and hit DeFel, and took the gun from defendant, pointing it at DeFel. Womack took the gun back, telling Fields that they should leave before the police came and that it was enough that they had already shot the victim. DeFel went to get help and the police arrived.

Sago, DeFel and Powe all testified as to their statements to the police and their identification of defendant based on photographs of defendant. Likewise, Detective Dignan testified as to his arrival on the scene and the interviews of the witnesses. Dignan further testified as to the arrest of defendant.

Dignan said that when initially at defendant's house, while defendant was being given his *Miranda* warnings, defendant said that he did not shoot anyone and that he was either at home or on his way home when the shooting occurred. After receiving the rest of the warnings, defendant said, according to Dignan, that defendant had nothing more to say.

Once defendant was taken into custody, fingerprints were taken and a gunshot residue test performed. A lineup was conducted, and all four occurrence witnesses identified defendant. After the lineup, at about 5:30 a.m., Dignan and Yucaitis spoke with defendant in an interview room. Defendant was advised of his rights and was told that he had been identified by witnesses and was in big trouble. Yucaitis testified that at this time defendant said that he was at home or on the way home when the shooting occurred and defendant denied any knowledge about the shooting. Then defendant again said that he had "nothing more to say" to the detectives. Dignan responded "that is fine," and that was the extent of the conversation.

Detective McWeeny and Assistant State's Attorney William Lacy spoke with defendant at about 7:45 a.m. Lacy gave defendant *Miranda* warnings once again and asked defendant if defendant wanted to give a statement. Defendant once again said that he did not know anything about the shooting and was either at home or on the way home when it occurred.

Detectives Glynn and Basile testified that on the evening of June 10, 1986, they were assigned to try to locate the second person involved in the shooting of Pippen. At about 6:30 p.m. they took defendant from the lockup and into the interview room. Defendant was given his *Miranda* warnings. The detectives told defendant that he had been charged with murder and that he would be going to court later that evening. The detectives further told defendant that it was their job to locate the second person and that they wished to talk to defendant. Defendant agreed to talk. He said that he was with Bruce Fields that evening, and that while the robbery was Fields' idea, defendant had shot the victim. Defendant gave the detectives an address where Fields could be found, and the detectives drove with defendant to the address before defendant was taken to court.

Neither Detective Glynn nor Basile called for a court reporter or a State's Attorney after defendant gave them his statement. Nor did they transcribe the statement. They prepared a report, which stated "Womack did make an admission to us, and he does state

that he and Bruce went to 6234 Dorchester after the shooting." The details of defendant's statement were not included in any report until after the assistant State's Attorney asked them to include the statements in September 1987.

Other witnesses at trial testified as to the condition of Sago's car, where a wrench with apparent bloodstains and a .38 caliber bullet were found, and as to the result of the gunshot test performed on defendant, which was consistent with a person having discharged a firearm or whose hands were near a gun which went off.

Officer Susan Phillips testified for defendant that she responded to a report of shots fired at about 1 a.m. on June 10, 1986. At the scene of the occurrence she interviewed DeFel, Powe and Sago. According to Officer Phillips, DeFel told her that he fled the scene after defendant displayed his revolver, fired the shot in the air and the victims were searched. DeFel told her that defendant pointed the gun at his (DeFel's) throat, and defendant hit him with a tire jack. According to Phillips, Powe told her that he was struck by one of the offenders and fled the scene.

Detective McWeeny also testified for the defense. He said that between 3 a.m. and 3:30 a.m. he spoke to Sago about the shooting while Sago was in the hospital being treated for his head injuries. According to McWeeny, Sago said that after he stopped the car to fix the tire, defendant began beating him with the tire iron, and that Sago eventually lost consciousness. McWeeny's report did not contain a verbatim account of his conversation with Sago, and did not include a reference to defendant having initially showed Sago his gun.

Defendant testified in his own behalf. He had been convicted of robbery and aggravated battery in 1984 and had been released from prison in May 1986. On the night of June 10, 1986, defendant and his friend, Bruce Fields went to the Shrimp Boat restaurant to eat, but the restaurant was closed. He saw two young black men chasing a white man on a bicycle. Defendant asked the black men for a cigarette, and though they did not have one, they thought that their friends by a telephone might have one. They walked over to the young men by the telephone.

Defendant knew one of the men, Rickey White, with whom defendant had graduated from high school. The group of men conversed. Defendant offered Sago $2 if Sago would drive him to 133rd Street, which Sago agreed to do. Defendant denied having a gun on his person. Sago stopped the car at 133rd and Prairie, and

took out a jack. All exited the vehicle except one of the men, who had previously told defendant that he had a gun. As Womack talked with Fields, the man in the car exited the car, put the gun to defendant's head and took defendant's money. When the man with the gun looked at the others, defendant grabbed the gun and it went off. The two men struggled, the gun discharged again and the man fell to the ground.

At this point people started running. Fields was backing the car away, and defendant got into the car and was driven home by Fields. Defendant did not call the police, he testified, because having so recently gotten out of jail he did not want to be involved. Defendant then related that the police came and arrested him and again took him to the station. When describing his arrest, defendant did not indicate that *Miranda* warnings were given. Also, on cross-examination, while defendant initially indicated that he did not recall whether Detective Basile gave him his *Miranda* warnings when he confessed to the shooting, defendant subsequently testified to the effect that the warnings had not been given him. Defendant did testify that his rights had been read him by the assistant State's Attorney. Defendant testified at trial that he did not confess to shooting Pippen and participating in the robbery to the detectives, but rather that he told them the truth consistent with his testimony at trial.

The primary issue defendant raises on appeal is whether the evidence of defendant's inculpatory pretrial statement should have been suppressed due to the failure of law enforcement personnel to scrupulously honor defendant's invocation of his right to remain silent.

The State argues that the issue presented for review has been waived by defendant's failure to raise the issue at trial or in defendant's post-trial motion. Defendant did not urge this ground of error at trial and did not raise it in his post-trial motion, and thus under *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 176, the issue has been waived. Defendant requests that we review the issue under the plain-error doctrine.

■■ ■ Under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), however, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Courts may consider plain error "where the record clearly shows *** an alleged error affecting substantial rights." (*People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 461.) This rule serves the dual purposes of "correcting serious injustices" and preserving "the

integrity and reputation of the judicial process." (*Young*, 128 Ill. 2d at 46.) Therefore, the rule applies only "when the question of guilt is close and the evidence in question might have significantly affected the outcome of the case [citations], or where the error alleged is so substantial as to reflect on the fairness or impartiality of the trial regardless of how closely balanced the evidence is [citations]." *People v. Sanders* (1983), 99 Ill. 2d 262, 273, 457 N.E.2d 1241.

■ To apply the plain-error exception to the waiver rule, courts should first determine if the record plainly shows that an error affecting substantial rights was committed. (*People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227.) This criteria is met in criminal cases when "the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial or sentencing hearing. [Citations]." *Young*, 128 Ill. 2d at 47.

■ Thus, a reviewing court must first examine the record to find the strengths and weaknesses of evidence against the defendant, because "if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved." (*People v. Carlson* (1980), 79 Ill. 2d 564, 576, 402 N.E.2d 233.) For example, if a defendant is clearly identified as the robber by three witnesses and treated for gunshot wounds received during the robbery, the evidence is not close enough for an appellate court to review an alleged error already waived by the defendant. *People v. Howell* (1975), 60 Ill. 2d 117, 121, 324 N.E.2d 403.

■ Second, the court must look for "those errors of such magnitude that the commission thereof" precludes a fair trial. (*Carlson*, 79 Ill. 2d at 576-77.) Such errors occur, for example, when the jury instructions fail to distinguish between intent to kill and other intents which a defendant might have had (*People v. Roberts* (1979), 75 Ill. 2d 1, 14-15, 387 N.E.2d 331), when instructions fail to distinguish between elements for an insanity acquittal and a mental-illness conviction (*People v. Fields* (1988), 170 Ill. App. 3d 1, 9-10, 523 N.E.2d 1196), or when credibility is an issue and the defendant's credibility is contrasted with the credibility and reputation of the State's Attorney's office (*People v. Sexton* (1987), 162 Ill. App. 3d 607, 615, 515 N.E.2d 1359).

■ In this case, we conclude that the error defendant complains of is not reviewable under the doctrine of plain error. An examination of the record reveals that the evidence was not close nor did any error occur of such a magnitude as to preclude defendant a fair trial. Defendant cites *People v. Parham* (1986), 141 Ill. App. 3d 149, 490

N.E.2d 65, in support of his argument that we should address the issue as plain error. In *Parham*, however, where defendant's right to counsel was not honored, the trial court specifically indicated that it placed weight on defendant's statement when the trial court found that defendant was legally sane at the time of the crime. (141 Ill. App. 3d at 155-56.) Here, there is no indication of specific reliance on the oral confession.

As indicated, the evidence in this case was not closely balanced. The record reveals that the State's occurrence witnesses' testimony was generally consistent and not impeached in any significant respect. Defendant's version of the events, on the other hand, was incredible in numerous respects. Defendant, who fled the scene and did not report the occurrence, testified that he and Fields were robbed by the victim and his friends, and that the victim was shot while defendant and the victim struggled for the gun. Defendant specifically denied beating or seeing any of his alleged assailants being beaten. Totally absent from defendant's version of the occurrence is any indication of how the substantial injuries to Sago took place. Defendant's memory as to the incident was weak and somewhat inconsistent as to details regarding the position of the individuals at the scene and the timing of the events. For instance, defendant was inconsistent in his testimony as to whether he or Fields was robbed first, and how much time passed in between the shooting and when he and Fields fled. In sum, we are convinced that the evidence in the case was not closely balanced and that defendant received a fair trial. Thus, we refuse to address defendant's proffered issue under the plain-error rule, as the issue has been waived.

■ Although defendant has not presented the issue separately, he presents a one-paragraph argument that his trial counsel was ineffective in failing to raise the issue below. We are not persuaded, however. One basis of the motion to suppress below was that *Miranda* warnings were not given to defendant in the first instance, and there was some ambiguity in defendant's testimony as to whether he did receive his *Miranda* warnings. Thus, we do not question the tactical decision of defense counsel at trial not to raise the issue now raised.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

EGAN and LaPORTA, JJ., concur.