THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRUCE ANDRAS *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 1—88—1375, 1—88—2526 cons.

Opinion filed December 23, 1992.—Rehearing denied March 24, 1993.

Michael J. Pelletier and Gordon Berry, both of State Appellate Defender's Office, and Randolph N. Stone, Public Defender (Ira Churgin, Assistant Public Defender, of counsel), both of Chicago, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Laurie Page, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW* delivered the opinion of the court:

Defendants Marc Johnson and Bruce Andras were each charged with one count of murder and two counts of attempted murder and aggravated battery. They were tried simultaneously before separate juries. Johnson was found guilty of all charges and sentenced to concurrent terms of 28 years for murder and 19 years for each attempted murder conviction. Andras was convicted of two counts of attempted murder for which he was sentenced to concurrent terms of 21 years' imprisonment. On appeal, Johnson contends that his post-ar-

---

*Justice McMorrow participated in the disposition of this case prior to her becoming a member of the Supreme Court of Illinois.

rest statement should have been suppressed because the police failed to scrupulously honor his invocation of the right to remain silent. Andras contends that the State engaged in improper cross-examination of him and his alibi witness, and that he was denied a fair trial by numerous improper prosecutorial remarks in closing and rebuttal arguments.

The charges arose from a May 19, 1987, drive-by shooting in which Eddie Mercado was killed and Nicky Lanzarin and Luis Rodriguez were injured. Evidence was presented at trial that the defendants and the victims were members of rival gangs, the Latin Kings and the Cobras. Earlier in the evening of May 19, an altercation occurred between members of the two gangs. Johnson and Andras were among those involved, and eventually a fight broke out in which Johnson sustained a cut on his lip. Later that night, Johnson and Andras secured guns, stole a burgundy Chevrolet and drove around looking for members of the Cobras and their affiliates, the Disciples. Johnson was driving and, according to Andras' statement, he was in the back seat wearing a red devil mask over his head. A third defendant, who was tried separately, was in the front passenger's seat. At approximately 11 p.m. they turned onto Mozart Avenue, where Lanzarin lived. Several members of the Cobras were congregated in front and in the vicinity of Lanzarin's house. Johnson stopped the car briefly, and he and Andras opened fire. Eyewitnesses testified that gunfire erupted from both the driver's and passenger's sides of the car and that shots were also fired through the rear window as the car began moving down the street.

The responding police officers received a report of a car matching the description given by eyewitnesses to the shooting a short distance from the scene. When they arrived at the car's location, they observed that the rear window was broken out and saw three men, one of whom an officer recognized as Johnson, running in a gangway toward an alley. After a chase, Andras was apprehended in a second-floor apartment. Johnson was arrested approximately one hour later when he drove up to his house.

Neither defendant contends that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt. Therefore, we will discuss the remainder of the evidence only to the extent necessary and relevant to the issues presented.

Johnson filed a pretrial motion to suppress an inculpatory statement he made approximately nine hours after his arrest. The motion alleged that the police (a) failed to advise him of his constitutional rights; (b) obtained the statement by physical and mental coercion; (c)

continued interrogation of him after he elected to remain silent; and (d) refused to allow him to consult with an attorney.

The substance of Johnson's statement was testified to at trial by Assistant State's Attorney Cawley (ASA Cawley). When questioned by Cawley, Johnson at first denied any involvement in the shooting, claiming that he had been at the beach with his girl friend. After further conversation, however, Johnson admitted that he was the driver of the car and that when he and Andras saw the rival gang members on the street, they opened fire.

At the hearing on the motion to suppress, Officer Marquez testified that he and Officers Kurz and Scalise arrested Johnson at approximately 2 a.m. on May 20, 1987. Marquez advised Johnson of his *Miranda* rights, reading them from a preprinted card, before transporting him to the fourteenth district police station. Johnson stated that he did not want to talk to the officers, but he did not request an attorney. None of the three officers attempted to question Johnson on the way to the police station. When they arrived at the station, Marquez took Johnson to a holding room where he was handcuffed to a ring on the wall and left alone for 30 to 40 minutes, at which time tactical officers arrived to transport him to Area 5 headquarters.

Officers Kurz and Scalise each testified that the holding room is at the rear of and accessible only through the tactical office. They remained in the tactical office working on reports the entire time Johnson was in the holding room. Neither officer spoke to Johnson, nor did anyone enter the holding room during the 30 minutes Johnson was detained there.

Detective Dorsch testified that Johnson was brought into Area 5 headquarters at approximately 3 a.m. and placed in an interview room. Between 3 and 5 a.m., when Johnson was taken out for approximately 30 minutes to appear in several lineups, Dorsch entered the room only once, and only to observe Johnson's physical appearance. At 11 a.m., Dorsch told Johnson that he and ASA Cawley wanted to talk to him about the shootings. ASA Cawley advised Johnson of his *Miranda* rights, which Johnson stated he understood, and Dorsch informed Johnson that he had been identified in the lineups. Following a 45-minute conversation, ASA Cawley asked Johnson if he would agree to put his statement into writing. Johnson declined and, for the first time, stated that he wanted a lawyer. Johnson was not asked to sign a form acknowledging receipt of his *Miranda* rights. Dorsch denied that Johnson asked for an attorney either before or during the interview.

ASA Cawley testified that when he arrived at the police station at approximately 6:15 a.m., he spoke to Dorsch and other detectives and some witnesses. Dorsch informed him that he had not spoken with Johnson. At 11 a.m., Dorsch and Cawley met with Johnson. Cawley advised Johnson of his *Miranda* rights and asked if Johnson was willing to discuss the shooting. When, at the conclusion of the conversation, Johnson refused to give a written statement and requested counsel, Cawley and Dorsch immediately left the room. He had no further contact with Johnson. He did not take notes during the conversation with Johnson, but he composed a summary of it in his felony review folder afterward.

Johnson testified that none of the arresting officers advised him of his *Miranda* rights, nor did they ask him any questions. When he arrived at the fourteenth district police station, the sergeant on duty told him that he had 20 minutes to tell them, the police, about the shooting. The sergeant then punched him in the mouth, causing a cut and swelling of his lip. The sergeant also showed him a photograph of a man whose face was mutilated and warned him that the same would happen to him if he did not tell the sergeant what he wanted to hear. Johnson did not see the sergeant again after that encounter. He remained handcuffed in the room for a few hours, after which he was taken to the lockup for a few more hours and then to the Area 5 headquarters.

On the way to Area 5, the transporting officers, one of whom was Officer Scalise, told him that they knew he was the driver of the car used in the shooting, and advised him to make it easy on himself by telling them what they wanted to hear. He did not respond. He was placed in an interview room at Area 5 and handcuffed to the wall. Dorsch came in an hour later and, without advising him of his rights, began to question him. Johnson asked for an attorney, but Dorsch ignored the request and continued questioning him for three to five minutes. Johnson told Dorsch that he had not been involved in the shooting. Approximately 45 minutes later, Dorsch returned with Cawley and they began to question him. No *Miranda* warnings were given. Johnson requested an attorney at the outset of the conversation and again midway through it, but Cawley and Dorsch did not respond to his requests. It was not until the third time he asked for counsel that questioning stopped.

Sergeant Berry and Detective Herigodt both testified that Berry was the only sergeant on duty at the fourteenth district police station when Johnson was brought in and that they were together in Berry's office the entire time Johnson was in custody there. The arresting of-

ficers testified that Johnson had a scab on his lip when they arrested him. The rest of the police officers and Cawley also testified that the cut did not appear to be a fresh injury.

Johnson has not pursued, on appeal, his pretrial claim that he was physically abused by the police. He has also recanted his assertion that the arresting officers did not advise him of his constitutional rights. He contends, however, that his statement should have been suppressed because his invocation of the fifth amendment right to remain silent was not scrupulously honored by the police. He asserts that his statement was the product of repeated efforts by the police to undermine his resolve to remain silent.

In *Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326, the United States Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " The factors the Court considered in determining that Mosley's invocation of the right to remain silent had been honored included that a significant amount of time had elapsed between interrogations; that the subsequent interrogation was by a different officer; and that it was prefaced by a fresh set of *Miranda* warnings. In *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, the Court held that "interrogation" is not limited to express questioning but also includes words and actions on the part of the police which the police know or should know are reasonably likely to elicit an incriminating response from the accused.

The first "interrogation" of which Johnson complains is the alleged statements by the officers who transported him to Area 5 headquarters that they knew he was the driver of the car used in the shooting and that he should make it easy on himself by telling them what they wanted to hear. He argues that these remarks were an attempt to elicit an incriminating statement from him and thereby constituted the "functional equivalent" of interrogation (*Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682), in violation of his previously invoked right to remain silent.

■ As noted above, according to Johnson's written motion to suppress and his suppression hearing testimony, he was not advised of his rights when he was arrested, and he did not say anything to the police officers. As the trial court observed, Johnson made no claim at the suppression hearing that he had invoked his right to remain silent at the time of his arrest.

For the first time on appeal, Johnson argues that Marquez' testimony that Johnson said that he did not want to talk to the officers established that he did, in fact, invoke his right to remain silent when he was arrested, and that the police subsequently failed to honor that decision. The trial court did not err in denying the motion to suppress on a ground not presented to it. Johnson's failure to raise this assertion in the trial court constitutes waiver. *People v. Coleman* (1989), 129 Ill. 2d 321, 544 N.E.2d 330 (where testimony regarding a statement by defendant was objected to only on foundational grounds and defendant did not seek exclusion of the statement in his motion to suppress, the trial court did not err in allowing the testimony, and the issue of the alleged violation of his right to counsel was waived on appeal); *People v. Womack* (1991), 216 Ill. App. 3d 540, 576 N.E.2d 385 (defendant's failure to allege in his motion to suppress that the police did not honor his right to remain silent constituted waiver of the issue on appeal).

Further, the only evidence in the record that the officers who transported Johnson to Area 5 advised him to make it easy on himself by telling them what they wanted to hear is Johnson's testimony. He argues that a defendant's uncontradicted testimony, if not inherently improbable, may not be ignored. (*People v. Jordan* (1954), 4 Ill. 2d 155, 122 N.E.2d 209.) In *Jordan* there were no eyewitnesses to the crime with which the defendant was charged, and the defendant's version of the incident was uncontradicted, and partially corroborated, by the State's evidence. The court thus held that the jury improperly disregarded the defendant's testimony. Johnson's reliance on *Jordan* is misplaced. From our review of defendant's testimony in its entirety, we find numerous portions which were either in conflict with other testimony or which were inherently improbable.

For example, Johnson testified that the sergeant on duty at the fourteenth district police station punched him and threatened to mutilate his face if he did not confess within 20 minutes. Five officers testified, in substance, that Johnson had a scab on his lip when he was brought in to the police station, and that no one punched, threatened or even spoke to him the entire time he was in custody there. Johnson himself additionally testified that he never again saw the sergeant who he claimed had demanded the confession, and that no one else questioned him. Although he has abandoned that claim on appeal, it was part of the entire version of events related by Johnson, the credibility of which was the issue before the trial court.

Johnson further testified that he was held at the fourteenth district police station and the lockup for a total of four or five hours af-

ter his 2 a.m. arrest. He also claimed that Detective Dorsch came to the interview room to question him approximately one hour after his arrival at Area 5, and that the conversation with Cawley took place 30 to 45 minutes later. Thus, according to Johnson's testimony, he arrived at Area 5 between 6 and 7 a.m.; Dorsch questioned him between 7 and 8 a.m., and the conversation with Cawley occurred a short while later. In contrast, the police officers testified that Johnson was at the fourteenth district for no more than 30 to 45 minutes. Dorsch testified that Johnson arrived at Area 5 at 3 a.m.; that he was taken to lineups between 5 and 6 a.m.; and that he was alone in the interview room between 6 and 11 a.m. Cawley testified that Johnson was already in the interview room when he arrived at Area 5 at 6:15 a.m., and that their conversation began at 11 a.m.

Regarding the transfer to Area 5, Johnson's testimony that one of the transporting officers was Officer Scalise was contradicted by Scalise and Marquez. They both testified that Johnson was transported by two tactical officers whose names they did not know.

Where a defendant's testimony is contradicted, contains inconsistencies or is inherently improbable, the trial court is not bound to accept it. (*People v. Warren* (1965), 33 Ill. 2d 168, 210 N.E.2d 507; *People v. Carlton* (1975), 26 Ill. App. 3d 995, 326 N.E.2d 100.) Johnson's testimony regarding the events between his arrest and his statement was contradicted on numerous points by the other witnesses. Further, his assertion, which he maintained throughout the trial and until this appeal, that neither the police nor ASA Cawley ever advised him of his rights was inherently improbable.

Since Johnson persisted in his assertion that he was not advised of his rights *and* that he said nothing at all to the arresting officers, the questions of (a) whether the transporting officers advised Johnson to make it easy on himself by confessing, (b) whether that alleged remark constituted "interrogation," and (c) whether that alleged interrogation was a police attempt to undermine his resolve to remain silent were neither argued to nor specifically addressed by the trial court. However, from the court's remarks on the allegations which were asserted in the motion and in argument by defense counsel, it is apparent that the court did not find Johnson's account of his prestatement custody to be credible. Questions concerning the credibility of witnesses at a suppression hearing are best resolved by the trial judge, whose determination will not be disturbed unless it is contrary to the manifest weight of the evidence. (*People v. Jackson* (1992), 233 Ill. App. 3d 1089, 599 N.E.2d 1192.) In view of the conflicting testimony summarized above, the trial court's rejection of defendant's ver-

sion of the events between his arrest and his statement. was not against the manifest weight of the evidence.

■■ Johnson maintains, however, that Dorsch's denial that he interrogated him is belied by Cawley's trial testimony that before he spoke to Johnson, Dorsch told him that Johnson was asserting an alibi, and by the sidebar admission of the prosecutor that Johnson made an exculpatory statement to Dorsch. Once again, in light of Johnson's assertion that he never said anything to any police officers prior to his arrival at Area 5, Johnson may not now argue that his statement should have been suppressed on a ground, *i.e.*, that the alleged questioning by Dorsch constituted improper interrogation because of Johnson's earlier expressed election to remain silent, which was not presented to the court at the suppression hearing. *People v. Coleman*, 129 Ill. 2d at 340-41.

Moreover, while the statements made at trial indicate that Johnson made an exculpatory remark to Dorsch, the record does not establish when it was made or that it was in response to questioning by Dorsch as opposed to being volunteered by Johnson. Dorsch testified that he had contact with Johnson twice before his statement: the first time to check on Johnson's physical condition, and the second time to take him to lineups. The remarks made at trial regarding an exculpatory statement do not rule out the possibility that Johnson asserted his noninvolvement in the shooting on one of those occasions. Notably, defense counsel did not request reconsideration of the motion to suppress following these remarks at trial.

■■ However, even assuming *arguendo* that Dorsch questioned Johnson, and that the issue was properly raised and preserved for review, we do not believe that Johnson's statement to Cawley was the end product of repeated police efforts to wear down his resistance and make him change his mind. The *Miranda* decision (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) did not establish a *per se* proscription against the renewal of questioning by the police after the suspect's initial request to remain silent. The voluntariness of a later statement is determined by examining the totality of circumstances leading to it. Relevant circumstances include whether there was a significant time lapse between interrogations, whether different officers conducted the interrogations and whether the subsequent interrogation was prefaced by a fresh set of *Miranda* warnings. *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321; *People v. Easley* (1992), 148 Ill. 2d 281, 592 N.E.2d 1036; *People v. Gray* (1991), 212 Ill. App. 3d 613, 571 N.E.2d 489.

In this case, it is undisputed that the arresting officers did not question Johnson and that he did not make his statement until nine hours later. His testimony that, in the interim, two officers attempted to elicit an incriminating statement from him lacked credibility; but even the single remark concerning "making it easy on himself," which Johnson attributes to them, does not, in our view, rise to the level of "interrogation." (See *People v. Cooney* (1985), 136 Ill. App. 3d 989, 996, 484 N.E.2d 802 (officer's advice to suspect "to get it off his chest and to be a man" did not render his subsequent statement the product of duress).) The alleged questioning by Dorsch, who had not been present at Johnson's arrest, would have occurred, at a minimum, two hours after his arrest and, according to Johnson, lasted only three to five minutes. Credible testimony in the record established that Cawley readvised Johnson of his rights before their conversation, and that when Johnson requested counsel, all communication with him immediately ceased. The evidence does not support Johnson's claim that the police attempted to wear down Johnson's resistance or undermine his right to remain silent.

▄ With respect to Johnson's contention that Dorsch failed to advise him of his rights and ignored his request for an attorney, we note again that Dorsch denied questioning Johnson prior to 11 a.m.; that both Dorsch and Cawley unequivocally testified that Johnson was advised of his rights prior to that conversation; and that Johnson did not request an attorney until Cawley asked for a written statement from him. For the reasons stated above, the trial judge was entitled to disbelieve Johnson's testimony to the contrary. *People v. Jackson*, 233 Ill. App. 3d at 1091.

In sum, we find no error in the trial court's denial of Johnson's motion to suppress his statement. Accordingly, defendant Johnson's conviction is affirmed.

We turn then to the issues raised by defendant Andras. Andras contends that reversible error occurred in the State's improper cross-examination of him and another defense witness. Citing *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, and *People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143, Andras asserts that the State made improper and unsupported insinuations which resulted in prejudice to him.

Andras first argues that the State improperly insinuated in its cross-examination of him and of alibi witness Cecilia Serbia that Serbia had a strong bias to testify falsely because her boy friend was a member of the same gang to which Andras belonged, without any proof of such gang affiliation.

On direct examination, Serbia testified that she and Andras and a mutual friend, Elizabeth Cordova, were together the entire evening of the shooting in front of Cordova's house, which was around the corner from Serbia's apartment building. On cross-examination, Serbia stated that she met Andras through her boy friend, who was a friend of Andras. The prosecutor later asked whether Cordova's street was "Latin King turf." Defense counsel objected and requested a sidebar conference during which the court ruled that the question lacked foundation. Subsequently, over objection by defense counsel, the State was allowed to elicit from Serbia that she was aware of the presence of gangs in the area. However, objections to the State's questions as to whether the Latin Kings controlled the area were sustained. The prosecutor then asked whether Serbia herself was a member of a gang. The court again sustained defense counsel's objection and instructed the jury to disregard the question. The court called a second sidebar following the objection to the State's question whether Serbia's boy friend was a gang member, and admonished the prosecutor that while bias was a permissible topic of inquiry, he, the prosecutor, had "to be prepared to make good." The State then terminated that line of questioning.

Andras then testified in his own behalf. On direct examination, he acknowledged that he was a member of the Latin Kings. On cross-examination, the State asked Andras whether Serbia's boy friend was also a member of the Latin Kings. Andras stated "[n]ot to my knowledge. Not my organization." Andras also stated that Cordova's street was not Latin King territory. No objections were made to these questions.

In *People v. Nuccio* (43 Ill. 2d 375, 253 N.E.2d 353), the State engaged in lengthy and detailed cross-examination of defense witnesses regarding alleged misconduct of and threats to the victim by the defendant prior to the offense for which he was on trial. Believing the questions to be proper, provided that the State was prepared to prove the accusations in rebuttal, defense counsel interposed very few objections. However, the State failed to call any witnesses in rebuttal to substantiate the accusations, despite its representations that it would do so. The supreme court held that, in contrast to certain cases cited by the State in which the challenged evidence was "brief and of little significance," the record before it contained "substantial numbers of unsupported insinuations which, if considered, could have seriously impeached the credibility of the defendant and his witnesses." (43 Ill. 2d at 396.) In *People v. Wallenberg* (24 Ill. 2d 350, 181 N.E.2d 143), the State asked a defense witness if he had been convicted of robbery,

but made no attempt, after the witness' denial, to prove the conviction. The *Wallenberg* court held that the interrogation was improper, but ruled that the misconduct was not prejudicial because the question was later stricken and the trial judge was not improperly influenced by it.

██ In the case before us, the challenged portion of the cross-examination of Serbia consisted of seven questions. A few of the State's questions regarding Serbia's general knowledge of neighborhood gang presence were allowed, but the objections to specific questions regarding her and her boy friend's gang membership were sustained, and the jury was instructed to disregard the questions. Pursuant to admonitions by the trial court, the State then discontinued that line of inquiry. Since the court sustained Andras' objections to the challenged questions, there was no admitted evidence for the State to rebut. Further, it was undisputed that gangs existed in Serbia's neighborhood, that Andras was a member of the Latin Kings, and that the Latin Kings were rivals of the gang to which the victims belonged. Indeed, there can be no question that the jury was fully cognizant that the shooting was gang-related since, aside from the police witnesses, the State's other witnesses were all admitted gang members.

Thus, while we agree with Andras, and the trial court, that the State ventured into a line of questioning for which it lacked evidentiary support, the questioning was neither so extensive nor the insinuations so significant as to prejudice Andras. Finally, any impropriety in the State's cross-examination was cured by the court's rulings sustaining defense counsel's objections and its instructions to the jury to disregard the questions.

Andras also contends that the prosecutor improperly cross-examined Serbia regarding her alleged refusal to speak to him prior to trial. The prosecutor elicited from Serbia that she did not notify the police that Andras was with her on the night of the shooting. He then asked whether she had ever called him to tell him he was prosecuting the wrong person, to which defense counsel's objection was sustained. In a series of questions to which no objections were made, the prosecutor elicited that he met Serbia in the presence of Andras' attorney outside the courtroom just before she testified. He then asked if she had refused to talk to him. Defense counsel objected and requested a sidebar conference at which he argued that the question was improper because it created a false impression that she refused to speak to the prosecutors when, in fact, the State had been supplied with Serbia's address but made no previous attempt to interview her. The court ruled that if the prosecutor elicited from Serbia that she refused to

speak to him, the court would take judicial notice, and allow defense counsel to argue, that the State was supplied with her name and address in advance of trial. Following the sidebar, the State did not repeat the question. Upon completion of Serbia's testimony, the court declined to take judicial notice of Serbia's prior availability to the State, noting that Serbia did not admit that she refused to speak with the prosecutor and that the State abandoned its questioning on that point.

Andras maintains that prejudice resulted both from the State's question and the court's refusal to take judicial notice of Serbia's prior availability. He argues that although Serbia did not answer the State's question, the question itself informed the jury that she had refused to speak with the prosecutor before testifying; and that defense counsel was unable to rehabilitate Serbia because she could not testify that the State had, but did not take, the opportunity to interview her prior to trial. Andras argues that it is improper to cross-examine a witness by way of unsupported insinuations of misconduct when no appropriate testimony is offered to support the insinuations.

■ Once again, *People v. Nuccio* (43 Ill. 2d 375, 253 N.E.2d 353) and *People v. Wallenberg* (24 Ill. 2d 350, 181 N.E.2d 143) are distinguishable, in that both cases involved accusations of prior criminal misconduct. Declining to speak to the prosecutor before testifying did not constitute misconduct. Thus, we do not agree with Andras' argument that the question was improper on the ground that it insinuated misconduct.

Further, as with the line of inquiry regarding gang membership, the State did not repeat the question after the sidebar conference. Since no response was given to the question, we cannot say that the trial court's declination to inform the jury that the State had been given Serbia's name and address was an abuse of discretion.

Moreover, contrary to Andras' assertion, the court's decision did not prevent defense counsel from attempting to rebut any "misimpression" that Serbia refused to speak with the prosecutors. The State elicited from Serbia, without objection, that she had not contacted anyone from the State's Attorney's office prior to trial. On the basis of this testimony, defense counsel could have asked her whether *she* had been contacted by anyone from that office prior to the encounter outside the courtroom. A negative response coupled with her testimony, in response to the State's question, that the prosecutor introduced himself to her only a few minutes earlier would have countered any impression that she refused to cooperate with the State. No such line of inquiry was pursued on redirect examination.

Andras also contends that the entire cross-examination on Serbia's failure to notify authorities concerning Andras' alibi was improper. Since, as noted above, no objections were made to the questions of whether she contacted the police or anyone from the State's Attorney's office, the issue has been waived.

In any case, it is permissible to use prior silence to discredit a witness' testimony as long as it is shown that the witness had an opportunity to give information and, under the circumstances, a reasonable person would have come forward with the information. (*People v. Knott* (1991), 224 Ill. App. 3d 236, 586 N.E.2d 479.) Numerous cases have held that where a witness is a friend of the accused and had knowledge of the friend's arrest, evidence that the witness failed to give exculpatory information is admissible to impeach the witness. *E.g., People v. Knott*, 224 Ill. App. 3d at 254-55; *People v. Conley* (1989), 187 Ill. App. 3d 234, 543 N.E.2d 138; *People v. Taylor* (1986), 141 Ill. App. 3d 839, 491 N.E.2d 3.

■ In the present case, Serbia testified that she met Andras six months before the shooting and saw him at least once a week. She, Andras and a mutual friend spent almost six hours together on the evening of the shooting. She learned of Andras' arrest the following day, but did not tell anyone that Andras was with her until defense counsel called her eight months later. The State's questioning of Serbia regarding her failure to provide information which might have exonerated Andras was permissible to impeach her alibi testimony.

*People v. Watson* (1981), 94 Ill. App. 3d 550, 418 N.E.2d 1015, on which Andras relies, is distinguishable because, there, the alibi witness testified that she did not learn the date of the crime until five months after the defendant's arrest. The court held that the State failed to establish a foundation for her impeachment, but ruled that other evidence rendered the error harmless. Defendant also cites *People v. Ortiz* (1990), 207 Ill. App. 3d 1, 565 N.E.2d 228, for the proposition that because Serbia was not a member of Andras' family, it was error for the prosecutor to cross-examine her about her failure to contact authorities. That was not the holding in *Ortiz*. The *Ortiz* court merely noted that witnesses may have difficulties contacting authorities about an accused's innocence. However, the court stated the general rule allowing cross-examination to attempt to impeach an alibi witness and held that the rule was particularly applicable in that case, where the alibi witnesses were members of the Ortiz family.

Andras further contends that it was improper for the prosecutor to ask him whether certain State witnesses were "wrong" in their

testimony. *People v. Barnes* (1989), 182 Ill. App. 3d 75, 537 N.E.2d 949.

In *Barnes*, the court held that a prosecutor is prohibited from asking a defendant his opinion of the veracity of witnesses who have testified against him because such questions invade the province of the jury to determine the credibility of witnesses, and because forcing the defendant to call the State's witnesses liars demeans him in the eyes of the jurors.

■■ We agree with the principles stated in *Barnes* and that the State questions were improper. As Andras acknowledges, however, defense counsel objected to only one of the questions, thereby waiving the impropriety of the preceding questions. Also, when counsel did object, the trial court promptly sustained the objection and instructed the jury to disregard both the question and Andras' answer, thus curing the impropriety.

Andras' final contention is that he was denied a fair trial by the cumulative effect of numerous improper remarks by the prosecutors in closing and rebuttal arguments. In an extensive argument on this issue, Andras cites no fewer than 20 instances of allegedly improper argument within the following general categories: that the main theme of the State's arguments was that in order to believe the defense the jury had to find that all the State's witnesses were lying; and that the prosecutors improperly vouched for the credibility of the State's witnesses and interjected their personal thoughts into argument, made insinuations unsupported by the evidence, and appealed to the jury's sympathy for the deceased and his family.

A review of closing arguments reveals that defense counsel made no objections to the State's closing argument. During rebuttal argument defense counsel objected to two isolated comments regarding trial testimony. Those objections were sustained. He also objected to a remark he asserts was an unsubstantiated insinuation. With respect to that remark, the trial court sustained the objection and, in a lengthy narrative, admonished the jury that the comment was not to be considered for any purpose during deliberations. Further, that insinuation was the only prosecutorial remark pointed to in Andras' post-trial motion as being improper.

It is fundamental to our adversarial system that counsel object to errors at trial. The failure to do so operates as a waiver of the right to a review of the alleged errors on appeal. The rationale underlying these rules is that a timely objection gives the trial court the opportunity to prevent or correct any errors by sustaining an objection and instructing the jury, and that a defendant should not gain the advan-

tage of obtaining a reversal through his failure to act. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Center* (1990), 198 Ill. App. 3d 1025, 556 N.E.2d 724.

The plain error doctrine provides a limited exception to the waiver rule. (*People v. Carlson*, 79 Ill. 2d at 577-78.) The purposes of the doctrine are to correct serious injustices and to preserve the integrity of the judicial process even though the error has not been properly preserved for review. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461; *People v. Carlson*, 79 Ill. 2d at 576.) The plain error exception is applied where the evidence is closely balanced or the error was of such magnitude as to have affected substantial rights and deprived the defendant of a fair and impartial trial. (*People v. Carlson*, 79 Ill. 2d at 576-77.) Whether or not the improper remarks were objected to at trial, a reviewing court will not reverse a conviction unless the remarks were so prejudicial that real justice has been denied or that the verdict likely resulted from the error. *People v. Carlson*, 79 Ill. 2d at 577.

Applying these principles to the instant case, we conclude that defendant waived, by his failure to object, any error based on the alleged improper remark and that reversal is not warranted under the plain error doctrine. First, Andras gave a detailed confession of his involvement in the shooting. Having fully reviewed the transcripts of the hearing on his motion to suppress the confession and of the trial proceedings, we see no evidence that his confession was involuntary or that he had some motivation to confess falsely, as was present in *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222 (defendant's confession indicated he feared gang retaliation, and, due to numerous conflicts in testimony, the evidence was closely balanced), on which Andras relies. In addition to his confession, there was strong circumstantial evidence linking Andras to the shooting. That evidence included that he was involved in an altercation with some members of the victims' gang earlier in the evening and that he was apprehended by the police after he was observed running from the car used in the shooting with defendant Johnson, who was positively identified by several witnesses as the driver of the car. Further, a review of the voluminous record of this case, consisting of two supression hearings and the trial itself, convinces us that Andras received a fair and impartial trial. Moreover, since the jury did not find Andras guilty of murder, we cannot say that the prosecutors' arguments so prejudiced the jury against him that, but for the remarks, the verdict likely would have been different.

We do not intend our holding to suggest that improper prosecutorial argument will be tolerated by the courts. As stated in *People v. Starks* (1983), 116 Ill. App. 3d 384, 396, 451 N.E.2d 1298, 1306, "[a] consistent and intentional course of prosecutorial misconduct is not condoned simply because a reviewing court concludes that that misconduct has failed to achieve its obvious purpose of denying a defendant a fair trial."

While prosecutors are permitted wide latitude in their closing arguments, the arguments must be based upon the evidence or reasonable inferences from it. (*People v. Morgan* (1991), 142 Ill. 2d 410, 568 N.E.2d 755; *People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596.) At the same time, a defendant may not complain of remarks which are provoked or invited by the defense. *People v. Lyles* (1985), 106 Ill. 2d 373, 478 N.E.2d 291; *People v. Smith*, 199 Ill. App. 3d at 854.

In this case, certain of the prosecutors' remarks exceeded the scope of appropriate argument. The State's repetitious argument that the defense theory was that the State's witnesses were all liars who were engaged in a conspiracy against him was a sardonic and exaggerated characterization of the defense case. However, the State stopped short of arguing that in order to believe Andras, the jury would have to find that all of the State's witnesses were lying. Thus, the argument did not rise to the level of reversible error. See *People v. Knott* (1991), 224 Ill. App. 3d 236; *People v. Siefke* (1990), 195 Ill. App. 3d 135, 551 N.E.2d 1361; *People v. Hunley* (1989), 189 Ill. App. 3d 24, 545 N.E.2d 188.

Further, since Andras denied any involvement in the shooting or confessing to it, and portions of his testimony strongly suggested that the police manufactured certain evidence against him, the argument was not entirely lacking an evidentiary basis. We also note that in his own summation, defense counsel countered the State's remarks by arguing the absurdity of the notion that police officers and lawyers are always truthful, and his strong suggestions that portions of their trial testimony were recently fabricated. It is our belief that defense counsel's argument and the trial court's admonitions to the jury that arguments are not to be considered as evidence minimized any prejudice the State's remarks otherwise may have caused. Similarly, we do not believe that the other unobjected-to comments of which Andras now complains were sufficiently prejudicial as to either have deprived him of a fair trial or affected the verdict.

Finally, the prosecutor's remarks concerning the present and future suffering of the mother of the deceased victim, Mercado, as a

result of his death were invited by and a direct response to defense counsel's comment on the tragedy of the shooting and the grief it caused the deceased's mother. Also, since the jury did not find defendant guilty of Mercado's murder, the remarks obviously did not affect the verdict.

In conclusion, because defense counsel's failure to object to the State's arguments or to raise them as error in his post-trial motion precluded the trial judge from preventing or correcting any improprieties, the issue of prosecutorial misconduct has been waived. Additionally, for the reasons discussed, we hold that the comments, even where improper, did not individually or cumulatively deprive Andras of a fair trial or contribute to his convictions for attempted murder so as to warrant reversal on the basis of plain error.

Consequently, defendant Johnson's convictions of murder and attempted murder, and defendant Andras' convictions of attempted murder, are affirmed.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.