THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BENJAMIN BARNES, Defendant-Appellant.
First District (5th Division)   No. 1—86—2682

Opinion filed April 7, 1989.

Randolph N. Stone, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Andrea K. Muchin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant Benjamin Barnes appeals his conviction and sentence after a second jury trial for the crime of unlawful use of firearms by a felon (Ill. Rev. Stat. 1985, ch. 38, par. 24—1.1). The first trial ended in a mistrial being declared because the jury was unable to reach a verdict. After defendant was found guilty in the second trial, he was sentenced to five years' imprisonment and fined , $10,000. On appeal, defendant charges that a number of evidentiary errors denied him a fair trial. He also contends that the fine imposed was "erroneous" because the court failed to consider his financial resources or his ability to pay and he was denied his constitutional rights to equal protection and due process because he was prosecuted under section 24—1.1 of the Criminal Code of 1961 (unlawful use of firearms by a felon), rather than section 24—3.1 (unlawful possession of firearms) (Ill. Rev. Stat. 1985, ch. 38, pars. 24—1.1, 24—3.1). For the following reasons we reverse and remand the cause for a new trial.

Pursuant to the case presented by the State, on October 4, 1984, three police officers observed a 1974 blue Cadillac near the intersection of Francisco and Adams in Chicago, Illinois. The Cadillac had license plates registered to a different car. A male driver later determined to be defendant and a female passenger later determined to be defendant's girlfriend, Unita Brown, were in the car. After waiting a few minutes, the officers drove their car up behind and to the right of the Cadillac. One of the officers knocked on the window of the Cadillac

on the passenger side and asked Brown to open it. Another officer noticed defendant had a gun tucked into the back of his pants on the left side, and he yelled to his fellow police officers that defendant had a gun. A second officer also saw the gun. All three officers then drew their own guns and ordered defendant and Brown out of the car. Instead of complying with the request, defendant put the Cadillac in gear and drove off at a high speed southbound on Sacramento. The police got into their car and pursued defendant west on Adams, south on Sacramento and east down an alley. The three officers subsequently saw defendant throw the gun out of his car window into the alley and continue driving to the next street, where he turned and stopped. The officers thereafter placed defendant and Brown under arrest, put them in the backseat of their car, and drove back to the alley where defendant had tossed the gun. They recovered the gun on the apron of a garage in the alley. One of the officers unloaded the gun, a .380 semiautomatic.

The police then took defendant and Brown to the police station. At the station, the police inventoried defendant's possessions, which consisted of a beeper and $4,229 in cash. Although the officers later stated they did not see the gun in Brown's possession, one of the reasons given for her arrest was "possible" unlawful use of weapons. None of the officers who arrested, questioned and booked Brown mentioned her name in their official police reports. Brown was released several hours after her arrest. Defendant subsequently stipulated that he had been convicted of burglary on November 7, 1979.

Defendant's and Brown's testimony indicated that Brown and defendant were on their way to a bank to get a cashier's check with which defendant intended to purchase a home when they were approached by the police. Defendant testified that it was not until after he and Brown had been told to get out of the car that he learned Brown had a gun. He then drove away from the scene and, while passing through an alley, he stopped the car to enable Brown to open her door to throw the gun out because her window would not open. Brown stated that she threw the gun over the hood of the car into a nearby yard. She further stated that she had gotten the gun two weeks earlier from her brother's friend because she had been attacked on two different occasions; the first time she was robbed and the second time a man exposed himself and made sexual advances to her before she was able to get away from him.

Defendant was subsequently found guilty of unlawful use of firearms by a felon, sentenced to five years' imprisonment, and fined $10,000.

On appeal, defendant, with respect to his evidentiary errors argument, asserts that the exclusion of testimony concerning his good character and peacefulness—his specific community, political and church activities—admitted at his first trial without objection by the State and excluded in his second trial was reversible error, that the repeated admission of evidence that $4,229 in small bills was recovered from his person was reversible error, and that the State's cross-examination of him about his fatherhood of children by different women, his employment history and his opinion on the credibility of adverse witnesses was reversible error. The State argues that much if not all of the claimed evidentiary errors were either justified by defendant's trial tactics or waived by a failure to object or raise the issues in his posttrial motion. In response, defendant contends that in any event the cumulative effect of the evidentiary errors was tantamount to plain error. We agree with defendant.

We find it unnecessary to delve into the record to determine whether defendant waived his right to raise these evidentiary errors on appeal because, even if he had, we may nonetheless consider them pursuant to Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)), in the interest of justice, since we believe they resulted in extreme prejudice to defendant, thus denying him a fair trial. With respect to defendant's first argument concerning the exclusion of character evidence, we observe that it is well settled that relevant character traits may be admissible in a criminal case if such traits are inconsistent with the commission of the crime charged. (*People v. Wells* (1967), 80 Ill. App. 2d 187, 224 N.E.2d 288.) This is accomplished not by introducing evidence of specific acts or personal opinion (*Voga v. Nelson* (1983), 115 Ill. App. 3d 679, 450 N.E.2d 1364), but by introducing evidence of a defendant's general reputation for the specific character trait (*People v. Lewis* (1962), 25 Ill. 2d 442, 185 N.E.2d 254).

Here, the State argues that defendant failed to properly seek to introduce evidence of good reputation, but rather sought to introduce evidence of specific acts of goodwill—his regular attendance at "block club" meetings, coaching and sponsorship of the neighborhood basketball team, fundraising and leadership duties at awards banquets at his church, and his candidacy for State Representative of the 19th Legislative District—and that those specific acts were completely irrelevant, as determined by the trial court, to his guilt or innocence of the crime for which he was charged, *i.e.*, the unlawful use of firearms by a felon. Moreover, the State argues, the trial court did permit defendant at his second trial to give a "brief biographical sketch" and, accordingly, defendant was in fact allowed to introduce evidence of his general rep-

utation for good character as to his employment, marital status, ordinary church attendance and a "reference" to community work. The State therefore contends that the trial court properly denied the proffered evidence of defendant's specific activity in his community.

■■■ We agree with the State that specific acts by defendant in support of his character were properly denied by the court, but only initially. We find that as the trial progressed, and as a result of the State's introduction of *specific bad character evidence against defendant*, which we believe the trial court erroneously admitted because it was irrelevant to the crime charged, defendant should have been allowed to respond with evidence of his specific acts of goodwill, since it is well settled that a party may introduce evidence that would ordinarily be improper to introduce where the other party has opened up the issue and the party seeking to introduce the otherwise improper evidence will be prejudiced unless he is allowed to introduce it. (See *Voga v. Nelson* (1983), 115 Ill. App. 3d 679, 450 N.E.2d 1364.) More specifically, we note that the case against defendant depended solely on the weight the jury accorded the testimony of the witnesses as to whether it believed defendant, rather than Brown, possessed the gun. Defendant's credibility was critical to a determination of this issue by the jury since there was no overwhelming evidence as to defendant's guilt, *i.e.*, the only evidence presented was the testimony of the three police officers that defendant possessed the gun as opposed to defendant's and Brown's testimony that Brown possessed the gun. As discussed more fully below, the State's evidence concerning defendant's possession of $4,229 in cash in small bills, his fatherhood of two children by different women, and his employment history was irrelevant to the crime for which he was charged and was presented by the State for the sole purpose of unfairly damaging defendant's credibility by depicting him as a person involved in illegal enterprises, a womanizer, an untrustworthy, trouble-making employee, and a liar.

For example, based on the State's sole position that evidence of the $4,229 in cash found in defendant's possession when he was arrested should be admitted to inform the jury of police investigatory procedure, the trial court allowed all three officers to testify as to the "small" bills recovered, the denominations of which were delineated to the jury as 20 50-dollar bills, 104 20-dollar bills, 73 10-dollar bills, 3 5-dollar bills, and 4 1-dollar bills. The court also allowed the State to cross-examine Brown concerning the money, *i.e.*:

> "[PROSECUTOR]: Now you said that you and Mr. Barnes were—where was it that you were going to?
>
> [BROWN]: We were going to purchase a cashier's check.

\* \* \*

Q. What was that for, ma'am?

A. For a building that Ben was going to buy.

\* \* \*

Q. Did he buy the building?

A. No.

\* \* \*

Q. Where was he going to get the money from [*sic*] the cashier's check?

A. He had the money on him.

Q. How much money was that again, $4,229?

A. That is correct.

Q. Did you see him with that money before he got in the car?

A. I know he had it on him.

Q. You know he had the $4,000 on him?

A. Right.

Q. *Where did he get that $4,000?*

A. *He worked for the city.*

Q. *Does he get paid in 20's and 10's?*

A. I'm not sure how he gets paid, sir.

Q. *So you don't know where he got the money from, is that correct?*

\* \* \*

Q. *Did you ever see him walking around with $4,000 or that kind of money before?*" (Emphasis added.)

The State further cross-examined defendant in great detail regarding the money, *i.e.*:

"[PROSECUTOR]: [The money that you were taking to the bank to purchase a cashier's check] was the money, the $4,229.00?

[DEFENDANT]: Yes it was.

Q. *That money was in what type of bills?*

A. *Different numbers on the bills, 50's, 20's, 10's.*

Q. *Mostly 20's and 10's, correct?*

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Sustained.

[PROSECUTOR]: *Tell us what kind of bills they were and what type of denominations.*

A. *50's and 20's and 10's.*

Q. *How many 20's and 10's?*

A. I don't know.

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Sustained.

[PROSECUTOR]: How many bills did you have?

[DEFENSE COUNSEL]: Objection, Judge.

[THE COURT]: 'I don't know' will be the answer.

[PROSECUTOR]: Well, you said that you got some money from a bank loan?

A. Right.

Q. And you used this book here as being your bank book from which you make your payments from?

A. Not use it.

\* \* \*

Q. When did you take the loan out?

A. I took it in April, I believe. It was in April.

Q. April of 1984?

A. Right.

Q. And you took the loan out from the bank?

A. Yes.

Q. For $3,500?

A. Yes.

Q. From the Chase Bank, is it?

A. Chase Manhattan.

Q. *Did you take the loan out in 50's and 20's and 10's?*

A. No, I didn't.

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Sustained.

[PROSECUTOR]: What did you do with the money from April of '84 until October of '84 when the police came to your car?

A. I had it in different contracts with other buildings that I was going to buy from HUD and at each time I didn't the bid [*sic*]—

Q. *So you kept the money in your house, is that what you are telling the jury?*

A. Yes.

Q. *$4,000 in cash in your house?*

A. Well, periodically they would give me a check, I would put the check in the bank and then when something else came up I would go and get the money.

Q. Where did you keep the money, in the bank?

A. In the bank?

Q. Yes, you are saying you deposited the $4,000 in the bank

previously and then took it out again?

A. No, it wasn't. Each time you purchase a house there are different figures that you have to come up with for the escrow you have to put up.

Q. What I am trying to find out is what you did with the money *you say* you got from the Chase Manhattan Bank, what you did with it from April until October, *the money that you kept in 20's and 50's and 10's,* where was the money at during this time period?

A. I have a safe at home.

Q. A safe?

A. Yes.

Q. *You took out $3,500, a loan, and got the money in 20's?*

A. No.

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Sustained.

[PROSECUTOR]: Where did you get the money from when you came downstairs?

A. What do you mean?

Q. Where had you been keeping it?

* * *

[THE COURT]: He said the safe.

[PROSECUTOR]: *Is that the way you normally conduct business?*

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Sustained. I know the defense went into this on direct examination but still it is a gun charge and the charge is not the possession of money." (Emphasis added.)

In closing argument, the State again commented on the money found in defendant's possession, *i.e.*:

"[PROSECUTOR]: *He can't come in here and tell you 'I never had the $4,000'* because the police got the $4,000 and they inventoried it and there is an inventory slip for it." (Emphasis added.)

■ Evidence by the State having no tendency to prove the issue being tried and serving only to cause the jury to believe that a defendant is a bad person is improper impeachment. (*People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298.) A new trial may be granted to a defendant where irrelevant matters have been injected into his case resulting in denial of a fair trial. (See *Starks*, 116 Ill. App. 3d 384, 451 N.E.2d 1298; *People v. Thomas* (1974), 18 Ill. App. 3d 306, 309 N.E.2d 744.) In the instant case, clearly the amount of cash recovered from defendant's possession was irrelevant to proving he was guilty of the

unlawful use of a firearm. Yet, from the very onset of trial (the State's opening statement), throughout the trial (testimony by the three police officers, as well as testimony elicited from Brown and defendant) and at the end of trial (the State's closing argument), the jury was bombarded with this irrelevant evidence, which took on the appearance of being a central issue to be considered by the jury in its assessment of defendant's credibility and which could only have suggested to the jury that the cash was obtained through some illegal means. Although the court admonished the jury at one point that the possession of U.S. currency is not a violation of the law *per se* and the jury was informed that the money was subsequently returned to defendant and no charges concerning the money were filed, we cannot say that this information cured the effect of admission of this evidence, especially when considered with the other evidentiary errors assigned by defendant.

■ Similarly, the trial court erroneously allowed the State to discredit defendant by examination of his *specific* lifestyle. More particularly, the following colloquy occurred with respect to defendant's fatherhood of children by two different women:

"[PROSECUTOR]: Now this lady that came in here and testified for you, that is your girlfriend, is that correct?

[DEFENDANT]: Yes.

Q. She has been your girlfriend for several years?

A. No, not several, just 3 years.

Q. 3 years?

A. Yes.

Q. But she is not the mother of your son or your daughter?

A. No, she is not.

Q. What is the name of the mother of your daughter?

A. Dolores ***.

Q. What is the name of the mother of your son?

A. Cathy ***.

Q. *2 different women again?*

A. Yes.

Q. You are not married to any of these women?

A. No, I am not." (Emphasis added.)

Although defendant testified that he was not married but had two children, it was improper for the State to examine him concerning the fact that his children had different mothers. Such examination was not only irrelevant to the crime for which he was charged, but it is well settled that a defendant may not be cross-examined concerning personal vices or bad experiences. See *People v. Galloway* (1956), 7 Ill. 2d 527, 131 N.E.2d 474.

The State continued in this vein concerning defendant's employment history, *i.e.*:

"[PROSECUTOR]: You said you work for the city?

[DEFENDANT]: Yes, I do.

Q. What was that again that you did?

A. In the water department.

Q. The water department?

A. Yes.

Q. How long was it that you were working there?

A. I have been working there for 7 years.

Q. Well, isn't it a fact that you were hired in '78 for a period?

A. Right, that was because when—in '79 when I was convicted of the burglary.

Q. So you were terminated in '79 and you weren't rehired again until '81, is that correct?

A. That is correct.

Q. And you were again on leave of some sort in the last year and a half?

A. No, just a year.

Q. Over a year?

A. Yes, since June.

Q. So you haven't worked for the city [for] over a year?

A. Yes.

Q. *And in fact there is some sort of a hearing pending or some sort of commission on your case about whether or not you should even come back to work?*

A. Because of the new administration is the reason because of a hearing, to my knowledge.

Q. Right now you aren't scheduled to go back to work?

A. There is a hearing pending.

Q. *There is a hearing?*

A. Yes." (Emphasis added.)

Although defendant testified on direct examination that he worked for the City of Chicago, his mere mention of his place of employment did not open the door for the State to question him on the collateral matters of his alleged employment-related misconduct and termination (see *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298) or to examine him with respect to a personal vice or bad experience (see *People v. Galloway* (1956), 7 Ill. 2d 527, 131 N.E.2d 474).

We further observe, aside from the character evidence issue, that the State improperly sought to elicit defendant's opinion on the

veracity of its witnesses involving the central question to be decided. Specifically, the State questioned defendant step by step relative to the events leading up to his arrest, each time asking defendant if the statements were true, to which defendant answered "yes." The State's final question posed to defendant was, "So the only part that you disagreed about was who had the gun, right?" to which defendant answered "yes." We observe that it is well established that a prosecutor is prohibited from asking a defendant his opinion concerning the veracity of other witnesses who have testified against him because such questions invade the province of the jury to determine for themselves which witnesses are telling the truth. (*People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293.) Such questions are also considered damaging because in effect they force a defendant to call the State's witnesses liars by which the defendant is therefore himself demeaned and ridiculed before the jury. (*People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450.) We believe that the State's questioning of defendant was undisputably designed to reach this prohibited result.

■ Based on the foregoing, we conclude that the cumulative effect of the admission of the irrelevant bad-trait evidence and the State's questioning of defendant with respect to the veracity of the adverse witnesses was not harmless beyond a reasonable doubt, since the witnesses' testimony was so closely balanced and the credibility of the witnesses was the single crucial factor underlying the jury's determination of defendant's guilt or innocence. Clearly, admission of the irrelevant evidence was improper and defendant should have been allowed to respond to this evidence with otherwise improper evidence of specific acts of his good character, since the State opened the door to these issues, and the trial court, having prohibited him from doing so, deprived him of a fair trial.

In light of our disposition of these matters, we find it unnecessary to address any other issues raised in this appeal.

The judgment of the circuit court is therefore reversed and the cause remanded for a new trial.

Reversed and remanded.

LORENZ and PINCHAM, JJ., concur.