(text box: 1) NO. 5-03-0307

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Madison County.  

)

v. ) No. 02-CF-200

)

HOWARD C. LINER, ) Honorable

) James Hackett,

Defendant-Appellant. ) Judge, presiding. 

________________________________________________________________________

JUSTICE HOPKINS delivered the opinion of the court:

Following a jury trial, the defendant, Howard C. Liner, was convicted of armed robbery (720 ILCS 5/18-2(a)(1) (West 2000)) and home invasion (720 ILCS 5/12-11(a)(1) (West 2000)) and sentenced to concurrent terms of 20 years in prison.  On appeal, the defendant argues that the evidence at the trial was insufficient to convict him and that he was denied a fair trial due to the prosecutor's misconduct.  We reverse and remand.

FACTS

By an indictment on February 14, 2002, the State charged the defendant with home invasion (720 ILCS 5/12-11(a)(1) (West 2000)) and armed robbery (720 ILCS 5/18-2(a)(1) (West 2000)) at the William J. (Jay) Baker home in Collinsville.  At the defendant's jury trial on December 10 and 11, 2002, the State presented the following evidence.  

On January 20, 2002, the defendant, who wore a dark-colored, puffy coat and whose hair was braided in cornrows, accompanied a taller man, known as "Junior," to the home of Michael Jones, who was a neighbor of Jay's and who had known the defendant for 12 years prior to that evening.  The two men asked Michael for marijuana, and Michael answered that he had none.  After the men inquired whether Jay had marijuana, Michael replied that Jay did not, and the two men indicated that they would go to the Baker home. 

Jay, his wife Rachel, his six-year-old daughter Kayla, his sister-in-law Jennifer Thompson, and Jennifer's boyfriend Aaron Engelke were in the Baker home.  At approximately 9:30 p.m., Jay responded to a knock at his door.  A black man (whom Jay later identified as the defendant), who wore a big, puffy jacket and whose hair was in dreadlocks, stood on Jay's porch and asked Jay if he had marijuana.  Jay answered in the negative.  Jay's view of the defendant was excellent.  A taller, heavier black man (whom Jay later identified as Ronald Robinson) subsequently walked up the steps to the porch, and Jay noticed that Ronald wore a thick coat also.  Before Jay shut the door, the defendant asked Jay whether he had any money.  

Michael saw the men approach Jay's home, remain on the porch for a couple of minutes, and leave.  After the two men left, Michael met Jay in an adjoining parking lot, and Michael denied that he had sent the two men to the Baker home.  

Approximately 30 minutes later, Jay responded to another knock at his door.  When he opened the door, the defendant pointed a black, shiny, small-caliber revolver at Jay's face.  Although the defendant had flipped his puffy coat inside out, Jay recognized the coat as the one the defendant was wearing 30 minutes earlier.  The defendant also wore black, slick gloves, and he was accompanied by another male.  Both men wore bandanas with eyeholes as masks.  Jay recognized the voices as those of the men who had approached his home 30 minutes earlier.  When the defendant pointed the gun in his face, Jay tried to slam the door and lock it, but the two men pushed through the door.  The defendant entered first, put the gun to Jay's head, and demanded that Jay give him money.    

While the defendant pointed the gun to the back of Jay's head, Jay led the defendant to the bedroom and gave him $140.  Jay testified that the defendant demanded more money and pointed the gun toward Jay's daughter, Kayla, who was sleeping on a pallet in the bedroom.  The defendant hit Kayla in the head with the gun and said: "You've got money.  If you don't give it to me, I'm going to kill her."  Jay carried Kayla to the living room and gave her to Rachel.  The defendant told Jay to get on his knees so that the defendant could kill him, but Jay refused.  

Ronald had stayed in the living room while the defendant and Jay went to the bedroom.  Ronald told Rachel, Jennifer, and Aaron to keep their heads down or they would die.  Rachel testified that when Ronald turned around, she grabbed the phone and called 9-1-1.  Ronald retrieved the phone and hung it up.  When the defendant and Jay returned from the bedroom, Ronald told the defendant that Rachel had called 9-1-1, and the two men left and took the cordless phone with them.  Next door, Michael Jones recognized the defendant's voice as the defendant yelled "come on, come on," and ran past Michael's home. 

 Collinsville police officer Dan Porter was dispatched to the Baker home.  Jay told Officer Porter that he had been robbed at gunpoint by two black males and that one of them was wearing a puffy jacket and was shorter than the other.  The Bakers indicated that they could see the men's facial features through the handkerchief masks they were wearing.

That same night, Collinsville detective Todd Link showed Jay a six-person photographic lineup, which included the defendant and men of similar hairstyle and build.  Jay unequivocally identified the defendant as the gunman who had entered his home.  In another photo lineup, Jay identified Ronald as the defendant's accomplice.  Although Rachel, Jay, Jennifer, and Aaron informed Detective Link that the perpetrators wore gloves, he confiscated the Bakers' phone base and a $20 bill from the scene; yet he failed to recover the missing phone and failed to recover fingerprints from the $20 bill.  Further, despite searching the defendant's bedroom at the time of the defendant's arrest, Detective Link was unable to find a puffy coat.

During the defendant's trial, Jay unequivocally identified the defendant as the gunman who had approached his house on the night of the robbery.  Jay testified that the defendant was one of the same two persons who had approached his home 30 minutes before the robbery, that he had the same voice, and that he wore the same puffy coat, although it was inside out.  

Rachel testified that during the robbery, she recognized the men as the same men who had visited her home 30 minutes earlier, because of their voices, hair, and faces.  Rachel testified that the homemade masks had not covered the men's faces well, and she unequivocally identified the defendant as the man who had entered her home holding a gun.

Aaron Engelke testified that he could not see the perpetrators' faces because they were wearing masks.  He testified that the first man, who held the gun, was smaller than the second man.

Jennifer Thompson testified she believed that the two men who robbed the Baker home were the same two men who had visited earlier because they wore the same coats and had the same body builds.  Because the defendant wore a mask during the robbery, Jennifer was unable to positively identify the defendant as the gunman, but she testified that the defendant's body shape was similar to the gunman's.  The prosecutor asked Jennifer if she was having a difficult time testifying, and Jennifer answered in the affirmative.  Over defense counsel's objection, the prosecutor elicited from Jennifer that since the robbery, she suffered medical problems, she worried constantly, and she took medication for anxiety and stomach problems.

Dickey Dalton, who was incarcerated in the Madison County jail, testified that he was an associate of the defendant's and that he had known the defendant for approximately seven years.  Dickey testified that in December 2001, he saw the defendant in the possession of two guns.  During direct examination by the prosecutor, the following colloquy occurred:

"Q. *** [W]hat kind of gun was it?

A. A .22 and a .25.

Q. Okay.  And what color was the small[-]caliber gun?

A. They were both black.

Q. Black[-]finish guns?

A. Yes, sir."

On cross-examination, the defense attorney elicited from Dickey that his previous statement had described the defendant as "a cold-blooded jackoff."  The defense attorney asked Dickey when he had last seen the defendant, and Dickey responded: "I saw him all the time.  Where I lived, [the defendant] would pull up and sell me crack all the time in my driveway.  There has [
sic
] been numerous times.  [The defendant] would pull up in a brown Cadillac."  The trial court struck Dickey's answer and instructed the jury to disregard it.  On redirect, the prosecutor elicited from Dickey, over an objection, that Dickey disliked the defendant because the defendant had sold Dickey fake drugs.  The prosecutor asked Dickey to specify the time period during which the defendant had sold drugs, and Dickey answered that the defendant had sold drugs during the previous few years.  After Dickey's testimony, the judge instructed the jury not to consider the past criminal dealings of Dickey and the defendant as evidence of the defendant's guilt in the present case.

The defense presented the following alibi evidence.

Dorothy Liner, the defendant's grandmother, and Evelyn Thomas, the defendant's great-aunt, both of whom lived with the defendant, testified that the defendant was at home on the night of the robbery.  

The defendant testified that on the night of the robbery, he was on intensive probation for a felony drunk-driving charge and that, pursuant to his curfew, he was home by 7 p.m.  The defendant testified that he had known Michael Jones when they were children but that they quit spending time together because Michael associated with older boys who vandalized, and the defendant chose not to engage in such behavior.  The defendant testified that he, alone, bought marijuana from Michael at approximately 6:40 p.m. on the night of the robbery.  The defendant testified that he and Michael argued because Michael cheated the defendant regarding the amount of marijuana sold.  The defendant testified that he wore a blue jean coat that night, that he did not own a puffy coat, and that he did not own any guns.   The defendant testified that before calling on Michael, he had visited the apartment building where his sister lived to get a shirt from Ricky Jenkins, his sister's boyfriend.  The defendant testified that Ronald also lived in that apartment building but that he was not at the apartment building with Ronald, that he did not socialize with Ronald, and that he was not with Ronald at any time on the night of the robbery.  The defendant testified that he lived approximately five minutes from Michael's house and that Ronald's apartment building was also within five minutes' distance. 

The defendant testified that he knew Dickey and that Dickey had offered to buy crack from him.  The defendant testified that he told Dickey that he did not sell crack and that he had purchased his Cadillac and nice clothes by working in fast-food restaurants.

On cross-examination, the prosecutor asked the following:

"Q. The first thing I want to ask you about is how does a guy on probation working at Burger King have a Cadillac and nice clothes?"

The defendant answered that he worked and saved his money, that he was paid to attend trade school, and that his Cadillac was an older, 1983 model.  The prosecutor continued:

"Q. Did you think that maybe your elderly relatives could have used that twenty bucks instead of buying pot with it?"

Defense counsel objected on grounds of relevance, and the court sustained the objection.

During closing arguments, the prosecutor said: "They stuck the gun in his little girl's face.  They tried to kill her."  He argued that the defendant "threatened to kill [the] six-year-old little girl."  The prosecutor argued as follows:

"Kayla Baker[–]when someone comes into her house in the winter time, the guy ought to be having a white beard and a bag of toys, not a .22[-]caliber revolver that he shoved into her face.  That's what he did.  And that person is guilty of Armed Robbery and Home Invasion.  The police did their job.  The prosecution put on the evidence.  And now it's your job to convict him.  And when you convict him, you make this whole county safe for all the Kayla Bakers that have a right to be asleep in their own home without having a guy like that come in and shove a gun in her face."

During closing arguments, the prosecutor referred to Dickey Dalton, Michael Jones, and Ronald Robinson as the defendant's friends.  He challenged the defendant's credibility, referring to him as "the person with the Cadillac, and the good clothes, and enough money to buy the marijuana that he was buying, working at Burger King." 

During rebuttal closing argument, on the dry-erase board, the prosecutor wrote "guilty" with an arrow pointing to the defendant.  After defense counsel objected, the prosecutor stated:

"[The defendant] isn't guilty because I wrote it on the board.  He's guilty because of all this evidence.  ***  This county, and particularly little girls like Kayla Baker, have [
sic
] a right to be protected by their father when he can.  And he almost died protecting her.  ***  She's got the right to be protected by the prosecutors, who want to get the right guy.  And she's got the right to be protected by the juries in Madison County.  And when you find the Defendant guilty of Armed Robbery and Home Invasion, you're not just protecting Kayla Baker.  You're protecting every child and every citizen in every home in this county."

After deliberations, the jury found the defendant guilty of armed robbery and home invasion.  On December 27, 2002, the defendant filed his posttrial motion, wherein he argued that the verdict was not supported by the evidence, that he was prejudiced when the prosecutor wrote "guilty" on the dry-erase board with an arrow pointing toward the defendant, and that the trial court erred in allowing Jennifer to testify regarding the injuries she sustained as a result of the robbery.  On April 23, 2003, the trial court sentenced the defendant to two concurrent terms of 20 years in prison.  The defendant filed a timely notice of appeal.

ANALYSIS

The defendant argues that he was denied a fair trial by the prosecutor's misconduct in questioning witnesses, making highly improper and prejudicial arguments, misstating the evidence, and making a demonstration during closing argument that inflamed the passions of the jurors.  We find it unnecessary to determine which evidentiary errors the defendant waived his right to appeal, because we consider them pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) in the interest of justice.  We believe that the errors, when considered cumulatively, prejudiced the defendant and denied him a fair trial.

The defendant argues that he was denied a fair trial when the prosecutor elicited from Michael Jones that the defendant sought to purchase marijuana.  The State counters that this testimony was proper as evidence of the defendant's motive to commit armed robbery and home invasion.  We agree with the State.

"It is a basic principle of our criminal justice system that the prosecutor owes the defendant a duty of fairness."  
People v. Dunsworth
, 233 Ill. App. 3d 258, 269 (1992).  Because this duty extends throughout the trial and includes closing arguments, the prosecutor has an ethical obligation to refrain from presenting improper and prejudicial argument.  
Dunsworth
, 233 Ill. App. 3d at 269.  

Evidence of extraindictment offenses, crimes for which the defendant is not on trial,  is not admissible if relevant merely to establish the defendant's propensity to commit crime.  
People v. Lindgren
, 79 Ill. 2d 129, 137 (1980).  "[A] defendant is entitled to have his guilt or innocence determined solely with reference to the crime for which he is charged, and this determination is not to be influenced by evidence which overpersuades the jury that defendant's past misdeeds make him worthy of punishment."  
People v. Thomas
, 89 Ill. App. 3d 592, 604 (1980). 

 Evidence of other offenses may be admissible, however, if relevant to demonstrate other purposes, such as to show intent, motive, 
modus operandi
, knowledge, design, plan, identification, or absence of mistake.  
People v. McKibbins
, 96 Ill. 2d 176, 182 (1983).  "The trial judge must weigh the probative value of other-crimes evidence against its prejudicial effect and may exclude the evidence if its prejudicial effect substantially outweighs its probative value.  [Citation.]"  
People v. McGee
, 268 Ill. App. 3d 582, 586 (1994). 

In the present case, Michael testified that on the night of the robbery, the defendant and Ronald sought to buy marijuana from him and indicated to him that they believed that  Jay sold marijuana.  We accept the State's contention that if the defendant and Ronald believed that Jay sold marijuana, they may have believed that Jay would have a great amount of cash on hand and Jay's resident friends and family would be unlikely to call the police during a robbery.  This evidence, therefore, was relevant to establish the defendant's intent and motive for home invasion and armed robbery and was properly admitted.  Further, as the State notes, the defendant testified that he bought marijuana from Michael on the night of the robbery and that Michael shorted him on the amount.  The defendant cannot predicate error on the admission of evidence he introduced.  See 
People v. Hartford Life Insurance Co.
, 252 Ill. 398 (1911).

The defendant also argues that he was denied a fair trial when the prosecutor elicited from Dickey that the defendant sold illegal drugs.  The State counters that this testimony was proper pursuant to the doctrine of curative admissibility.  We disagree.  

Evidence of other offenses may also be admissible if the evidence is procured, invited, or acquiesced to by the defendant.  
McGee
, 268 Ill. App. 3d at 586.  Under the doctrine of curative admissibility, a party may present inadmissible evidence where necessary to cure undue prejudice resulting from an opponent's introduction of similar evidence.  
People v. Manning
, 182 Ill. 2d 193, 216 (1998); 
People v. Higgins
, 71 Ill. App. 3d 912, 931 (1979).  Where the door to a subject is opened by the defense on cross-examination, the State may, on redirect, question the witness to explain or clarify matters brought out during cross-examination, in order to remove unfavorable inferences or impressions raised during the cross-examination.  
People v. Thompkins
, 121 Ill. 2d 401, 444 (1988); 
People v. Sanchez
, 73 Ill. App. 3d 607, 610 (1979).  The doctrine is limited in scope, is merely protective, and goes only as far as is necessary to shield a party from unduly prejudicial inferences raised by the other side.  
Manning
, 182 Ill. 2d at 216-17.  To determine, in its sound discretion, whether to admit the curative evidence, the trial court must weigh the probable influence of the first evidence, the time and distraction incident to answering it, and the possibility and effectiveness of an instruction to the jury to disregard it.  
Higgins
, 71 Ill. App. 3d at 931.

In the present case, during cross-examination, the defense attorney elicited from Dickey that his previous statement had described the defendant as "a cold-blooded jackoff."  On redirect, the prosecutor elicited from Dickey that Dickey disliked the defendant because the defendant had, in the recent past, sold Dickey fake drugs. 

Although defense counsel elicited testimony that Dickey disliked the defendant, he did not open the door to prejudicial testimony regarding illegal drug sales between the defendant and Dickey.  See 
People v. Griffiths
, 112 Ill. App. 3d 322, 328 (1983) (although a party who opens the door to testimony on a particular subject is precluded from objecting to evidence on the same subject, that rule does not extend to foreclose a party from objecting to evidence on grounds not violated by the party's first admission of this evidence).  Accordingly, this evidence was not properly allowed pursuant to the doctrine of curative admissibility.  See 
People v. Williams
, 240 Ill. App. 3d 505, 506-07 (1992) (the State may not, under the guise of the doctrine of curative admissibility, violate the rules of evidence under the rationale of neutralizing an inference that is favorable to the accused). 

The error was compounded when the prosecutor thereafter suggested, during his examination of the defendant and during closing argument, that the defendant's Cadillac and nice clothes had been procured from his sale of illegal drugs, a suggestion that was irrelevant in proving whether the defendant was guilty of armed robbery and home invasion and served only to show that the defendant was not believable and was a bad person worthy of punishment.  See 
Thomas
, 89 Ill. App. 3d at 604 (the determination of the defendant's guilt of the crime charged is not to be influenced by evidence which overpersuades the jury that the defendant's past misdeeds make him worthy of punishment).  The prosecutor presented the jury with this irrelevant evidence, which took on the appearance of being a central issue to be considered by the jury in its assessment of the defendant's credibility.  See 
People v. Barnes
, 182 Ill. App. 3d 75, 84 (1989).  Although the court instructed the jury not to consider  the past criminal dealings of Dickey and the defendant as evidence of the defendant's guilt in the present case, we cannot say that this instruction cured the effect of the admission of this evidence. 

Similarly, the defendant argues that the prosecutor's question referring to his drug purchase in the face of his responsibility to support his elderly relatives was a blatant attempt to portray the defendant as a bad person, was improper, and was prejudicial.  We agree.  

"Evidence by the State having no tendency to prove the issue being tried and serving only to cause the jury to believe that a defendant is a bad person is improper impeachment.  [Citation.]"  
Barnes
, 182 Ill. App. 3d at 83.  A defendant may be granted a new trial where irrelevant matters have been injected into his case, resulting in the denial of a fair trial.  
Barnes
, 182 Ill. App. 3d at 83.  

The prosecutor improperly impeached the defendant by asking him whether he believed that his elderly relatives could have used the $20 with which the defendant conceded he bought marijuana.  See 
Barnes
, 182 Ill. App. 3d at 83.  Although the exchange was brief and the trial court sustained defense counsel's objection, the prosecutor's question was improper because it was intended only to suggest to the jury that the defendant was a bad person.  See 
Barnes
, 182 Ill. App. 3d at 83.  

The defendant also argues that the prosecutor improperly presented Dickey's testimony that the defendant possessed a .22-caliber revolver and a .25-caliber revolver.  The State counters that the evidence that the defendant owned guns of the type used during the robbery was relevant and proper.

Evidence regarding a weapon may be admitted into evidence where there is proof to connect it to the defendant and the crime.  
People v. Wade
, 51 Ill. App. 3d 721, 729 (1977).  A connection with the crime is shown if the defendant's weapon is suitable for the commission of the charged crime.  
Wade
, 51 Ill. App. 3d at 729.

In the present case, Dickey testified that during the month before the robbery, he saw the defendant possess two black-finish guns, a .22-caliber and a .25-caliber.  Jay described the gun that the defendant pointed toward him as a small-caliber, black revolver.  Evidence that the defendant was seen with a gun that fit the description of the gun used in the robbery was relevant (
People v. Gore
, 212 Ill. App. 3d 984, 990 (1991) (relevant evidence is that which has a tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence)); however, evidence that the defendant owned the additional gun was irrelevant.  

The defendant next argues that the prosecutor improperly presented Jennifer's testimony that she suffered physical problems as a result of the robbery.  The State counters that the introduction of such evidence was harmless.

Over defense counsel's objection, the prosecutor elicited from Jennifer that since the robbery, she suffered medical problems, she worried constantly, and she took medication for anxiety and stomach problems.  Although the prosecutor did not dwell on Jennifer's problems and did not comment on them during opening statements or closing arguments, this testimony was irrelevant to whether the defendant was guilty of armed robbery and home invasion, and it was improper.  See 
People v. Nickolopoulos
, 25 Ill. 2d 451, 454 (1962) (evidence of the extent of the victim's injuries was irrelevant and improper in a prosecution for assault with intent to murder with a gun); 
People v. Carpenter
, 49 Ill. App. 2d 101 (1964) (abstract of op.) (testimony regarding the extent of the victim's wounds was irrelevant and improper in a prosecution for attempted murder with a gun).  We fail to see how any reference to a crime victim's emotional and physical reaction to the crime is in any way relevant to the commission of crimes of this type.  The only purpose of introducing that evidence would be to prejudice the jury.   

The defendant next argues that the prosecutor improperly appealed to the jurors' emotions during closing argument and deprived the defendant of a fair trial.  The State counters that the prosecutor's errors, if any, were harmless or waived and not plain error.

"Our system of justice requires that a defendant's guilt or innocence be determined based upon relevant evidence and legal principles, upon the application of reason and deliberation by a jury, not the expression of misdirected emotion or outrage by a mob."  
People v. Johnson
, 208 Ill. 2d 53, 87-88 (2003).  Accordingly, "[a] prosecutor is prohibited from presenting argument which is calculated solely to inflame the passions and prejudices of the jury" (
Dunsworth
, 233 Ill. App. 3d at 267), and "argument that serves no purpose but to inflame the jury constitutes error" (
People v. Blue
, 189 Ill. 2d 99, 128 (2000)).  

Nevertheless, during closing argument, prosecutors have wide latitude to comment on the evidence and draw reasonable inferences therefrom.  
People v. Lane
, 256 Ill. App. 3d 38, 56 (1993).  When reviewing prosecutorial misconduct claims based on statements made during closing argument, we must examine the statements in their entirety and scrutinize them in their proper context.  
People v. Cisewski
, 118 Ill. 2d 163, 175-76 (1987).  Even if the prosecutor's comments exceed the bounds of proper argument, the jury's verdict will not be disturbed unless the prosecutor's remarks cause substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.  See 
Johnson
, 208 Ill. 2d at 115.

The defendant argues that the prosecutor misstated the evidence when he referred to Dickey Dalton, Michael Jones, and Ronald Robinson as the defendant's friends, but we find no error in this argument.  The prosecutor is allowed wide latitude in closing arguments to argue the evidence and draw reasonable inferences therefrom.  See 
Blue
, 189 Ill. 2d at 127.  The evidence demonstrated that Dickey considered the defendant an acquaintance, that Michael knew the defendant from childhood, and that the defendant and Ronald searched together to purchase marijuana and ultimately worked together to commit home invasion and armed robbery.  The prosecutor's characterizations of Dickey, Michael, and Ronald as the defendant's friends, however snide, were reasonable inferences from the evidence.  We do find error, however, with regard to the defendant's remaining allegations of prosecutorial misconduct during closing argument. 

The defendant argues that he was prejudiced when, during closing argument, the prosecutor wrote "guilty" with an arrow pointing toward the defendant.  As the prosecutor admitted after defense counsel objected to the action, the prosecutor's antics served no purpose.  The prosecutor's actions were intended only to inflame the jury and, therefore, constituted error.  See 
Blue
, 189 Ill. 2d at 128 (argument that serves no purpose but to inflame the jury constitutes error).  Its impact, however, was limited by these prosecutor's comments: "[The defendant] isn't guilty because I wrote it on the board.  He's guilty because of all this evidence."  And its impact was limited by the trial court's admonishments to the jury that neither sympathy nor prejudice should influence its decision.

The defendant argues that during closing argument, the prosecutor improperly mentioned Kayla's young age to inflame the jurors' passions.  The defendant complains of the prosecutor's remarks that "[t]hey stuck the gun in his little girl's face" and that the defendant threatened to kill the "six-year-old little girl."  The defendant also complains of these prosecutor's remarks:

"Kayla Baker[–]when someone comes into her house in the winter time, the guy ought to be having a white beard and a bag of toys, not a .22[-]caliber revolver that he shoved into her face.  ***  And now it's your job to convict him.  And when you convict him, you make this whole county safe for all the Kayla Bakers that have a right to be asleep in their own home without having a guy like that come in and shove a gun in her face.

* * *

This county, and particularly little girls like Kayla Baker, have [
sic
] a right to be protected by their father when he can.  And he almost died protecting her.  ***  She's got the right to be protected by the prosecutors ***.  And she's got the right to be protected by the juries in Madison County.  And when you find the Defendant guilty of Armed Robbery and Home Invasion, you're not just protecting Kayla Baker.  You're protecting every child and every citizen in every home in this county."

"It is entirely proper for the prosecutor to dwell upon the evil results of crime and to urge the fearless administration of the law."  
People v. Harris
, 129 Ill. 2d 123, 159 (1989).  "[L]imited prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependant solely upon its careful consideration of the specific facts and issues before it."  (Emphasis omitted.)  
Johnson
, 208 Ill. 2d at 79.  Yet, where "the prosecutor blurs that distinction by an extended and general denunciation of society's ills and, in effect, challenges the jury to 'send a message' by its verdict, he does more than urge 'the fearless administration of justice,' he interjects matters that have no real bearing upon the case at hand, and he seeks to incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation."  
Johnson
, 208 Ill. 2d at 79; see also 
Blue
, 189 Ill. 2d at 139 (the trial was permeated by the presentation of emotionally charged evidence, and the prosecutors "encouraged the jury to return a verdict grounded in emotion, and not a rational deliberation of the facts").  "The broader problems of crime in society should not be the focus of a jury considering the guilt or innocence of an individual defendant, lest the remediation of society's problems distract jurors from the awesome responsibility with which they are charged."  
Johnson
, 208 Ill. 2d at 77-78.

We find that the prosecutor's comments during closing argument had no purpose other than to inflame the passions of the jury and were improper.  By urging the jury to find the defendant guilty to "make this whole county safe for all the Kayla Bakers" and to "protect[] every child and every citizen in every home in this county," the prosecutor improperly argued that Kayla was a member of a class with which we, as a society, are sympathetic and that the defendant should be convicted because of the need to protect this class (see 
People v. Clark
, 335 Ill. App. 3d 758, 765 (2002)), and in effect, he challenged the jury to "send a message" by its verdict.  The prosecutor interjected matters that had no real bearing upon the present case and sought to incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation.  See 
Johnson
, 208 Ill. 2d at 79.  

In sum, the prosecutor elicited extraneous weapon evidence, asked the defendant an irrelevant question that attempted to show only that the defendant was a bad person, and elicited irrelevant testimony that Jennifer suffered ills since the robbery.  The defendant's conviction turned, in part, upon the rejection of his alibi defense.  The defendant's credibility was therefore at issue, and the prosecutor improperly impeached the defendant with evidence that the defendant sold illegal drugs.  See 
Clark
, 335 Ill. App. 3d at 767.  Additionally, the jury's deliberation was likely colored by the inflammatory nature of the prosecutor's closing argument, particularly insofar as it evoked sympathy for the victim based on her age and urged the jury to convict the defendant to protect other children in the county.  See 
Clark
, 335 Ill. App. 3d at 767-68.  

"Individual trial errors may have the cumulative effect of denying a defendant a fair trial.  [Citation.]"  
People v. Hall
, 194 Ill. 2d 305, 350 (2000).  "[A] pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain error doctrine.  [Citations.]"  
Johnson
, 208 Ill. 2d at 64. 

We cannot conclude, beyond a reasonable doubt, that the prosecutor's errors did not contribute to the defendant's conviction.  See 
People v. Campbell
, 115 Ill. App. 3d 631, 638 (1983).  The prosecutor's remarks exceeded the bounds of proper argument, and although when considered separately they did not cause substantial prejudice to the defendant, when considered cumulatively, the prosecutor's errors resulted in substantial prejudice to the defendant and denied him a fair trial.  See 
Johnson
, 208 Ill. 2d at 115.  We therefore reverse the defendant's convictions.

We note, however, that, when viewed in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of home invasion and armed robbery beyond a reasonable doubt.  See 
People v. Schott
, 145 Ill. 2d 188, 203 (1991).  Even if a defendant denies his guilt and the defense witnesses corroborate his alibi, his alibi defense does not, in and of itself, create a reasonable doubt of the defendant's guilt.  
Wade
, 51 Ill. App. 3d at 726.  When the identification of a defendant is an issue, the testimony of one witness is sufficient to support a conviction, even in the face of contradictory alibi testimony, provided the witness is credible and viewed the defendant under circumstances that would permit a positive identification.  
People v. Maounis
, 309 Ill. App. 3d 155, 162 (1999). 

The evidence overwhelmingly established that two black men committed armed robbery and home invasion against the Baker family.  The evidence also sufficiently established that one of those men was the defendant.  Michael Jones, who knew the defendant for many years, testified that "Junior" and the defendant, who was wearing a puffy coat and whose hair was in cornrows, came to his house on the night of the robbery, that the two men asked Michael if Jay had marijuana, and that the two men indicated that they would go to the Baker home.  Michael watched the two men approach the Baker home, remain on the porch for a couple of minutes, and leave.  Approximately 30 minutes later, he recognized the defendant's voice as the defendant yelled "come on, come on," and ran past Michael's home. 

On the evening of the robbery, Jay positively identified the defendant, from a photo lineup that included five other men with similar features, as one of the men who had visited his home prior to the robbery and as the armed gunman who committed the robbery in his home 30 minutes later.  Jay had a good opportunity to view the defendant during the defendant's initial visit.  Jay and Rachel testified that during the robbery the defendant's bandana mask was ineffective, that they saw the defendant's face through his mask, and that they recognized the defendant's build, coat, and voice.  See 
People v. Camel
, 59 Ill. 2d 422, 432 (1974) (the identification was reliable where the attacker attempted to disguise his appearance, only the lower part of his face was masked, and there as an adequate opportunity to view the attacker's other physical characteristics); 
People v. Hicks
, 134 Ill. App. 3d 1031, 1038 (1985) (an accused can properly be identified by his voice); 
People v. Nunn
, 101 Ill. App. 3d 983, 989 (1981) (an identification by voice is permissible and may establish the defendant's guilt beyond a reasonable doubt).  Their explanations for their identifications at the trial were consistent with what they had revealed to Officer Porter on the night of the robbery.  At the trial, both Jay and Rachel unequivocally identified the defendant as the gunman who had invaded their home and robbed them.  See 
People v. Slim
, 127 Ill. 2d 302, 308-09 (1989) (the factors to consider to evaluate the reliability of an identification: (1) the opportunity to view the accused at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the victim's level of certainty at the identification confrontation, and (5) the length of time between the crime and the identification).

Dickey Dalton testified that he had seen the defendant with the type of gun used in the armed robbery and home invasion of the Baker home.  Both the defendant and Ronald lived in the area and were familiar with the area, and the defendant admitted to being at Ronald's apartment building and at Michael's home on the night of the robbery.  The evidence against the defendant supported his conviction for home invasion and armed robbery.  Because the evidence was sufficient to convict the defendant, double jeopardy does not preclude the defendant's retrial.  See 
People v. Denny
, 221 Ill. App. 3d 298, 303 (1991).

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is reversed, and the cause is remanded for a new trial.  

Reversed; cause remanded. 

DONOVAN, P.J., and KUEHN
(footnote: 1), J., concur.

NO. 5-03-0307

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Madison County.  

)

v. ) No. 02-CF-200

)

HOWARD C. LINER, ) Honorable

) James Hackett,

Defendant-Appellant. ) Judge, presiding. 

___________________________________________________________________________________

Opinion Filed
: March 10, 2005

___________________________________________________________________________________

Justices
: Honorable Terrence J. Hopkins, J.

Honorable James K. Donovan, P.J., and

Honorable Clyde L. Kuehn, J.,

Concur

___________________________________________________________________________________

Attorneys
 Daniel M. Kirwan, Deputy Defender, Paige Clark Strawn, Assistant Defender, 

for
 Office of the State Appellate Defender, Fifth Judicial District, 730 E. Illinois

Appellant
 Highway 15, Suite #1, Mt. Vernon, IL 62864

___________________________________________________________________________________

Attorneys
 Hon. William A. Mudge, State's Attorney, Madison County Courthouse, 157 N. 

for
 Main Street, Edwardsville, IL 62025; Norbert J. Goetten, Director, Stephen E. 

Appellee
 Norris, Deputy Director, T. David Purcell, Staff Attorney, Office of the State's

Attorneys Appellate Prosecutor, 730 E. Illinois Highway 15, Suite 2, P.O. Box 

2249, Mt. Vernon, IL 62864

___________________________________________________________________________________

FOOTNOTES
1:
Justice Maag participated in oral argument.  Justice Kuehn was later substituted on the panel and has read the briefs and listened to the audiotape of oral argument.  

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 03/10/05.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.